NetChoice v. Attorney General, Georgia 25-12436. Mr. Thompson here for the appellant, Ms. Murphy back for more of the affiliate. Mr. Thompson, you've reserved four minutes of rebuttal time. Thank you, Your Honor. May it please the Court, John Henry Thompson for the Attorney General of the State of Georgia. Our Constitution does not enact Mr. Zuckerberg's business model any more than it enacts Mr. Spencer's social statics. NetChoice's members know that social media use among minors is addictive and harmful, but they're in this Court today asking you to lochnerize the social media industry, to immunize it from any attempt at consumer protection by the State of Georgia or any other state that is trying to protect its minors from the well-documented harms that time on its websites have been associated with. Now I want to make this concrete with a hypothetical or an illustration, if I may. The social media sites like to call themselves the modern public square. Well, let's take that analogy seriously. Let's imagine a private company buys a city block of downtown Jacksonville. It calls this the modern public square. You pay to get in, you have an account that is created, a contract is entered when you walk in. They then design this city block of downtown Jacksonville to be difficult for minors to leave. They design this city block of Jacksville in ways that result in minors spending upwards of five hours a day in this city block. Can I just ask you maybe, I hate to interrupt your flow, but so whereas with respect to the Florida case, speaking only for myself, I think the argument that it's content-based is pretty tough. With respect to this argument, I think you may have some problems. The generic definition seems to be content-neutral enough. Once you get into the cast of thousands of exemptions, I can only imagine the lobbying efforts that were at work to get those in the statute. But then I feel like we do sort of start running into some content categories. Not social speech, not teen speech, of which I'm kind of suspicious, but like real, live, honest goodness content categories. Happy to address all those concerns. I'll start with my top-line reaction to your question, which is it would be terrific work enough for today to reject their attempt to immunize the social media industry, qua social media industry, from regulation. So I completely agree with you on their top-line view about social media speech as a category. So if we get into the exceptions, again, I agree that our definition of social media is certainly content-neutral. The lion's share of the exceptions are very easily, I think, explained as functional differences between the way the websites operate. Yeah, some of them, I agree. Some of them run to function, but some of them seem to me to run to content. So a top-line response first. To the extent you think that there is one or two isolated exceptions in this statute that would render it subject to strict scrutiny and therefore unconstitutional, Barr v. American Association of Political Consultants tells you exactly what to do next, which is to sever that restriction, level up, and subject all of the sites to the same constitutional regulation that companies within the top-line definition of the statute are subject to. State law severance, though? I mean, we can't just do that just to do that. Well, I mean, I think Barr tells you exactly what to do under general severability principles, and Georgia's are identical to the principles. Is there a severance provision in this statute? There is not a specific severance provision in this statute. There is an overall severance provision built into the Georgia Code, and Georgia has very strong presumptions of severability the same way federal courts do. So I agree that would be... You do the work for us. Tell me which one is content-based. I have my thoughts, but I'd like to hear yours. Sure, sure. So the ones that NetChoice has identified in its brief are the sports news entertainment one. I think if you just... Big D. If you just keep reading that one, you get to why it is not content-based, because it is referring to the fact that content on those sites is generated by the site and not by users, which folds back into the question we were discussing about the overall definition about whether social media speech or social... Which ones are? Which ones are content-based? So we don't think any of them are. Okay. I think I will be... That's the problem we're in. Ended with, Your Honor. I think the toughest one for us, I think the toughest one for us is the career development. Which subdivision is that? So 36-616-V. V. The last one. Yes. Yeah, the very last one. And I think this does get to the level of generality problem with content, and I think at some level, everything on the internet is communicative. So they're playing this game where if you pass a law that is content-neutral in its kind of top-line definition, and then the legislature makes an empirical judgment about where minors are likely to be harmed because of the function the website is serving. And if it says job boards are not that kind of website, again, based on the function that the website... It's not an empirical judgment, but it's an empirical content-based judgment. So I think in... I don't think in kind of physical world, anyone would blink at a state saying that we're going to have different consumer protection laws for buildings that are hosting speed dating versus a building that's hosting a professional networking conference. I don't think anyone would say that that's a First Amendment violation. I think that is going to the function that that business is serving. But again, if you think that that provision is content-based, then... And if you think the rest of the statute would survive intermediate scrutiny as content-neutral, then you should sever that extension. So I don't want to hang up your entire presentation by marching through these, but I will just tell you that I actually am not that troubled by D, big D, news, sports, and entertainment, because I think it says news, sports, entertainment, or other content. Correct. So that kind of launders D for me, but I think E, potentially problematic, online shopping or commerce, F, interactive gaming, virtual gaming, H, single purpose community groups for public safety, O, where the, oh yeah, it's where the content is posted by the provider of the digital news, Q, S, agreed. So at what point do we say like, whoa, whoa, whoa, now we can't sever half the statute out? So, look, I agree at some point the severability analysis is harder or easier. If it's one, it's easier than if it's many. I still think we would win in that analysis, but again, I think to the extent we're going through exemption by exemption and trying to figure out whether they're content-based or not, I think many of the ones you raised are not content-based. I think they are going to the primary function of the way the website works. Gaming is one of those examples. But the, I think this does get back to something that was discussed in the first argument, which is there's been no attempt. Push back. Each of the ones that Judge Luck and I sort of flagged for you have the same basic architecture. They begin with a content category, and then there's this transitional word. So like with gaming, interactive gaming, virtual gaming, or an online service website or application, that allows the creation and uploading of content. So it seems like you've got to. Of content for the purpose. You are required to determine the purpose as part of the exception. I mean, that seems definitionally a content-based regulation or restriction, is it not? I mean, one that tells me you have to determine the content to see whether it applies seems definitionally content-based. I think the idea that the Georgia General Assembly was attempting to discriminate against all speech except speech falling into the categories and the exemptions is, I think,  I don't think that's what the legislature was attempting to do. I think what it was attempting to do is protect minors from websites that have been characterized by a particular set of harms because of the way that they are structured. Websites that are maximizing what the industry calls time spent. Websites that are engaging this kind of reward-response behavior that the companies know internally has massive cognitive effects on minors. John, so you were here for the oral argument, the first oral argument, and some of the questions I had with both the state's counsel and opposing counsel dealing with a facial challenge or what is required. Can you sort of answer some of those questions as it relates to the litigation that happened here, what the district court did, and whether that was sufficient as we dictated in both in Ray Georgia's Senate Bill 202 and by Moody? So the district court here disclaimed the need to conduct any kind of Moody-style analysis. It said, I don't have to do that because we don't care about the effects on the member platforms. This is all about users and access. So there's kind of this shell game going on where as soon as you try to pin them down on standing, on Moody, on the merits of whose rights are at stake, they switch to the other side, right? So if you say, well, you know, they say their Article 3 standing is based on their members, but their prudential standing is based on the users, and then on Moody they say, we don't need to worry about our members. It's all about the users. A few things with that. First of all, this party presentation idea, you know, we made all the Moody arguments below. The Supreme Court in Moody certainly was not relying on a party presentation issue given that these issues kind of came up at oral argument at the Supreme Court. So I think that's clearly wrong.  And I also don't think that changing the subject to users gets you out of Moody. The Supreme Court in Moody is practically begging litigants to proceed on a case-by-case basis given the diversity of the Internet. Even if it is users. I mean, let's take your brief brings up the point about pornography. I mean, if we're talking about users that are 16 and under, users that are 16 and under, it is constitutional to limit and restrict their access to sites that do fall within the definition that allow access to pornography, is it not? That is absolutely correct. We have raised that point about unprotected speech on the platforms. That would be the subject of a Moody analysis. I don't think it would be the only subject of a Moody analysis. Give me some others. So this court dealt in a case called Omegle about this site that was basically facilitating random interactions between anonymous strangers on the Internet. It led to what this court described as a horrific incident of sexual exploitation. I think it would be striking if our law could not be constitutionally applied to that site. I don't think Moody is saying that the only question in the facial analysis it requires is coverage under the statute. Certainly there are questions about that here. But I think in terms of whether it can be constitutionally applied, that is also a question that must proceed on an individualized basis. And Moody is saying that because it is recognizing the differences between this new media and past ones, they try to get around all these problems on standing, on Moody, on the merits, by just saying it's two sides of the same coin, right? We're speaking, they're listening. Maybe that was true with the soapbox in Hyde Park. But what Moody is saying is that's not how social media works. Justice Barrett's concurrence is talking about automated algorithms that simply provide feedback to the users of what they're seeing. You can't tell me that in that context, it's just this two sides of the same coin. Our users' rights are implicated, so our rights are implicated. So ignore all the Moody stuff, ignore the standing complications, treat this like that kind of classic First Amendment hypo. I just, I don't think that's appropriate and I don't think that's what Moody calls for. Thank you. We've got four minutes of rebuttal time remaining. Ms. Murphy? And can I ask you, so that your clock is not yet ticking, you've heard through the first argument and then sitting through the second and now entering the third. We've got a lot of questions about the Moody analysis. The way I think about both cases, I suppose, is in terms of like the universe of applications is that there are like three buckets. There's what I'll call like the conventional platforms, the good guy platforms, you know, sort of Instagram, meta, whatever. Then you've got, on the other end of the spectrum, you've got like the rogue platforms, incitement.com, truththreats.com, whatever. And in the middle, you've got what I'll maybe call like hybrid platforms, maybe like X and Reddit that are like maybe for the most part good guy, but there's this like seedy underbelly that allows pornography. And each one of those buckets seems to me like subject to a different First Amendment analysis, like arguably full First Amendment protection for the good guy bucket, no First Amendment protection for the bad guy bucket, for the rogue bucket, and some kind of Paxton, whatever that is, for the hybrid bucket. And so why in a facial challenge don't we need more of a record to understand how it would sort of cash out with respect to everybody? Sorry, now you get to go without me having hijacked your argument. Sure, no problem. And just for the record, I will say again, Aaron Murphy on behalf of the plaintiff here. So I think this is what tailoring analysis has always been all about. But what you would say is, okay, if your goal is to keep the children off the rogue services, then you have to tailor your law to address the rogue services. You don't get to say, you know what, there's like some books out there that are bad, so we're going to ban books. You're supposed to tailor it to the thing that you're worried about. That's why all that- Counsel, Moody seems to suggest that this is a threshold issue. I know in the last argument you seem to want to put them together, and maybe that is the right answer. But it seems to me, and in our law applying it, our precedent applying Moody, that there is a threshold issue of deciding whether there is substantial coverage such that you can go forward with a facial challenge, and then you ask the traditional, what's the content based not, what scrutiny we apply, and whether that scrutiny was sufficiently tailored. The Supreme Court didn't remand and say, you have to decide whether you can bring a facial challenge. They remanded and said, we need more information to see whether you win this facial challenge. So I don't think the court was saying, we've eliminated some category of facial challenges. They were saying, in the particular context of the law the court had at issue there, it was much less clear whether it actually implicated the First Amendment in all of its applications as far as what the court knew, because the court was worried that it covered some services. None of this had to do with users, because users just weren't at issue in Moody because of the way that law operates. They were worried it covered some services that are not engaged in First Amendment activity, and that the law, this might be the kind of law where sometimes it implicates the First Amendment and sometimes it doesn't. I don't think that really worked. If I can just- Yeah, I understand. I'm assuming you're right. I'm assuming everything you just said is right. Doesn't that still put us in the situation that Judge Newsom suggested, which is, even if we just look at users, there are some platforms for which users are going to have complete access because of the nature of the speech involved. There are some where, given the nature of the speech involved, minor users are not going to have any access because it's not constitutionally protected. And there are some sites that are hybrid. And that's exactly where I think you just go back to it. Moody, at the end of the day, applied traditional First Amendment doctrine that asks, have you shown, has the state shown, that there's more constitutional applications than unconstitutional? And if the state's concern is we want to keep you off of the sites that have a particular type of content, then pass a law like the law in Paxton that focuses on those. But the whole over-breath analysis is asking, did you come at this in a way where you define the universe-  I'm sorry. The district court disclaimed. I mean, I don't know if that's a fair- That's not a fair characterization. Okay. The district court suggested that there is complete identity between what is unconstitutional and what is, and what a First Amendment violation is. And I just don't think that's true as a matter of fact. I think what the district court actually said is this law implicates the First Amendment in all of its applications. And that's why I don't need- Do you agree with that? That the law implicates the First Amendment in all of its applications? Yes. I mean, I really, the state has never suggested some website where there's literally no protected speech. And that's what you would need to have this law not implicate. Maybe it's going to pass First Amendment scrutiny as to a website like the kind of websites in Paxton. But to say it doesn't implicate it, you'd need some website where there's literally no protected speech. And there's just, no one's ever even argued that in any of these cases. In your brief, don't you say that the, quote, the act's legitimate sweep is marginal at best? Yes. Right. So there is some legitimate- Well, at best means if there's any legitimate sweep. That's why we've got the caveat thing. If there's any legitimate sweep- So you think there's none? I mean, yeah, it's, it's, maybe you could say to the extent this law applies to like the Paxton type of website, you know, but I think this would be a radically overbroad way of dealing with that concern. That might be true, but don't we have to decide what is and is not, whether, to decide whether it's overbroad requires us to be able to say, what is the universe of the legitimate sweep? At best it's nothing, or at best it's a lot. And we have to see. No, I mean, I'd go back to the way the Supreme Court dealt with this in Stevens. You know, Stevens was your classic overbreath case, and is a case where they're relying on the rights of third parties and all of that, not just the rights of the individual. And what the court did is said, look, you know, the government isn't wrong that this could be constitutional as applied to the actual crush videos, but that nobody has been able to show that the principal application of this law is that, and the law is written in a way that ensures that it's not that. So come back to us with a law that's only covering crush videos, and you may be able to pass First Amendment scrutiny. But if you define your law in a way that ensures that it reaches far beyond, there's nothing in this law. First, this law, I mean, for all the talk we've just heard about addiction, this law doesn't have anything about features. It doesn't care what features you have. It only cares whether people can upload content onto it and view content. And second, this law has nothing in it that says, you know, we're going to look at whether a website has some content that's not protected vis-a-vis minors. They've never even argued that the focus of this law is about content that's all unconstitutional vis-a-vis minors. So if that's what your concern is, come back with a law that tries to craft the, you know, to address the concern in that way. Tailoring analysis asks, did you write your law in a way that's tailored to the interests you are advancing? And those interests that are being advanced here are not even the ones, you know, that we're talking about right now. That's not what they're saying that this law is about, that it's about keeping people off of rogue sites. This law is about keeping people off of things like Snap and Instagram. That's what this is all about. That's what they're talking about below. Are any of the interests in this case, or these cases, the parents' constitutional interest in raising their children and determining what they are exposed to, I think that's very heavy here. Absolutely. All right. Nobody is representing them. And that's the reason for this closeness that I was mentioning earlier. Why did the Supreme Court use closeness? Nobody is representing them at all. As a matter of fact, they're as far apart, the platform is as far apart as a parent trying to raise a child. You can imagine. Nobody was representing the parents in Brown, and there were no parents or minors in Brown. And the Supreme Court... Forget Brown. We're in this case, and we got parents' rights. Children almost have no rights that are given to them by the parents. I mean, with all due respect, it's a little hard to put it... I'm serious. But who represents them? Well, what the Supreme Court said is the way you represent parents is by... Do we appoint a guardian for the children? The Supreme Court expressly addressed this question in Brown, and what it said is you advance parental control by empowering parents, but not by having the state step in and decide itself that children cannot see certain speech unless and until their parents say otherwise. That's exactly... That's what the case was about. And the Supreme Court viewed itself as vindicating the rights of parents there by saying parents get to make the decision, not the state of California. This case would be entirely different if the parents were the plaintiffs. It depends with which parents they are. I mean, you could easily imagine a set of parents saying they don't like this law. Suppose the parents wanted the law enforced. Sure. The parents are free to join the state in defending the law. I mean, they can make... We're not suggesting you can't take into account the interests of the parents, but the Supreme Court said the way you do that under First Amendment scrutiny is that the government is not supposed to override the wishes of the parents and say, we're going to decide what speech you get to hear. It's by saying if the parent makes a decision, we can require people to follow it. Now you're in a standing problem. We are not in a standing problem. There was no parent and there was no child in the Brown case. The only plaintiffs in that case were the association that represented members that wanted to sell video games to minors. Only plaintiff. And the court based the whole thing on the rights of the minors. Can I turn back to Moody for a question, ask you two questions about Moody. So the first is, we talked a little bit about burden before here and in the first oral argument. So in Moody, and this is at the end part, it's page 744. It's part four of the opinion, so the meaty, you know, the important part for us. It says, so on remand, each court, that's the 11th and the 5th, must evaluate the full scope of the law's coverage. It must then decide which of the law's applications are constitutionally permissible and which are not. And finally, weigh the one against the other. The need for net choice to carry its burden on those issues is the burden of its decision to challenge the laws as a whole. What do we make of that? I mean, I think you take that and you look at it in the context of a law that the Supreme Court thought might not implicate the First Amendment in several of its applications. You agree it is, in that case, net choice is burden, right? It is the ultimate burden as the plaintiff within the context of the substantive standard. I mean, look, I will grant you there's a little bit of tension in some of these, because what the court has made very clear in pretty much every substantive- I appreciate you granting me that. It didn't seem like you granted me that a little earlier, but I appreciate you granting  You know, I mean, look, I litigated the net choice case, so I'm well aware of what party presentation arguments were made and were not made in that case. But I don't think the court was throwing out the window. The substantive standard that governs in First Amendment law, that, you know- Okay, so that gets to the second question. Earlier in this argument, you told me, I think it was in response to my question, what the court said there is, go do these things and then decide who wins. Can you point to me where it says that in net choice? It says, do these three things and then that person wins? Or does it do these things and then go have further litigation? Sorry, the three things, like, I just want to be sure I'm- I take the whole premise of the court's opinion to be, if you conclude that the law, because they set out the substantive standard at the beginning- Can you tell me where it says that? I can't give you, like, a pin site right now. I mean, the way I view it is, that's the part at the beginning where the court says, here's the inquiry. You know, the first section is the court laying out, here's what the inquiry is under, you know, determining whether the constitutional outweigh the unconstitutional. I take that whole section to be establishing. And if it turns out the unconstitutional outweigh the constitutional, like, the plaintiff wins. That's, you know, that's why they're remanding to do that analysis, so. And you know, I think that it's common ground, that if we establish that the law is unconstitutional, if somebody establishes that it's unconstitutional in most of its applications, we win. And I guess, you know, that's where I'd come back here to the problem that, you know, it's evident on the face of this law that it's over broad vis-a-vis the interests the state's asserting. So I don't think it works to say we've come up with the idea that there might be some constitutional application when it's obvious on the face of the law that it has so many unconstitutional applications. It doesn't work to say, you know, yeah, like, you got a real problem as to all the services that this is actually about. Again, the district court didn't seem to do that. It didn't say what, and that may be what the analysis is. It doesn't require evidence. It's just, hey, I've read this thing, and it applies to a large swath of speech. But that's not what the Supreme Court in Moody, this is why it's so critical, the difference between the law there and the law here, they were not saying that it applies to a large swath of speech. They were saying we're worried that because that particular law defined covered services in a way that was not tethered to, you know, kind of user interaction or core speech, that it might reach things like, I mean, the hypotheticals that were coming up were things like Uber, you know, like PayPal, like they've exempted PayPal, all the stuff that's here that you were saying earlier. I agree. There are several exemptions here that are more functional, several that are obviously content-based, but several that are functional. That's what the Supreme Court was saying. We're worried that law is written so broadly that it gets to these services that have like completely different functions. And I'm just speaking for myself. I'm worried that this law covers things that are clearly constitutional, which are speech for people on social media that are of tender age, people that, whatever that age is and however young that may be, it applies, okay, in pornography, it applies in the examples that Judge Newsom gave regarding incitement and true threats. Some of that stuff is out there, and I just, without an idea and without any sort of inquiry, it's really hard for me to say what overwhelms the other. And here's what I would encourage you to do, is to go look at the evidence the states themselves have presented in defense of these laws. They have experts. They put on declarations, there's depositions in the Florida case. Go look at it. They are not saying, man, we are really, really worried about seven-year-olds on social media. You agree there was no discovery or evidentiary hearing in this case, right? In this case, that's correct. But, you know, I mean, just to, helping you kind of think about all this writ large. But I also have to think about this case. Sure, but there were declarations here. And the declarations are not going on and on about, man, we are worried that there's a lot of services out there with porn that minors are accessing. Or man, like we got a real problem with six and seven-year-olds creating accounts on social media services. They are saying we need this law because so many teens and tweens are using these services. We're worried about them. That's the universe this is about. And they're worried about Facebook. They made the pornography argument. They made it as to Reddit and Twitter. They actually made the pornography argument more in terms of just trying to make the argument of we needed to present, to have our members present, you know, be individual plaintiffs. Not in terms of saying our law may be constitutional because it happens to cover a couple services that age-gate porn. Because there is conflicts between them. Because for some of your clients there is going to be legitimate sweep and some of your clients there's not. No, the legitimate sweep question at the end of the day in a facial challenge, there's, you know, it's constitutional or it's not. So even if there's some member or some service as to which it's constitutional, if it's unconstitutional as all the rest of them, that's what facial over-breath challenges are all about. So it's not enough for them to simply say we've hypothesized, you know, some like non-existent service that has nothing but unconstitutionally protected speech and therefore you can't resolve the fact that like 99% of this or every real world application that we know about actually does involve constitutionally protected speech. I think the state has more of a burden even under Moody to show that it's law actually has been tailored in some way to address the problems that it's asserting. I see my time is about up unless anybody has any further questions. Very well. Thank you so much. Mr. Thompson, you've got four minutes remaining. Thank you, Your Honor. I'm going to try to get four quick points out. First on Moody. The fact that there was a question about whether the laws in Moody, the law in Moody implicated the First Amendment is just one merits question that goes to whether the law has constitutional applications. There's nothing different in kind about the question whether the First Amendment is implicated versus other questions that arise under First Amendment analysis. Nothing in Moody suggests that it's a special rule for that one kind of First Amendment issue. Second, on the merits. One more pitch on this. SB 351 does not care about the messages conveyed by the platforms. It cares about protecting children from the psychological harm associated with spending time in digital environments that are built to exploit their underdeveloped brains and expose them to predation. I think all roads lead to strict scrutiny under Net Choices Theory. Either regulating social media, quasi-social media is content-based and gets you there, or if the state tries to do what Georgia did, which is have exceptions, you step on the content-based tripwire under this view of content, well, you have to look at it to see what kind of speech it is. And so, aha, we're in strict scrutiny. Isn't the Florida statute a pretty good evidence that there is another, there's a third way that you're not suggesting? I think it would be great if the court held that. I don't think Net Choice agrees with that. I don't think Snapchat agrees with that. Because what they do in laws like that is they pivot to, aha, we're going to switch back to our members' rights. You're interfering with our kind of Moody rights to interact with our users and provide things to their users. I understand, but there is a, assuming that Florida wins on this issue, a non-content-based way in order to give some sort of regulation protection to minors. I think all of the 40-plus states who joined, who have passed laws like this from across the political aisle would be delighted for a ruling from this court saying that the Florida model is a way to constitutionally deal with this terrible problem. We would certainly welcome that. We're just saying that, I think the real-world difference between those two laws is very small, which is why it kind of has this air of unreality about it. Because we're trying to accomplish the exact same thing. I mean, virtually all social media platforms are going to have one of these addictive features that Florida has identified. And so, I think that if this court says that's constitutional, we would certainly welcome that. I don't think the Constitution requires a state to structure their law exactly like Florida's. On standing, Judge Choflat, you mentioned a couple of times who's here to represent the kids. This is a fundamental issue. They are saying that in the First Amendment, there is automatic third-party standing. No questions asked. If we think minors, if they come in and assert that minors have a First Amendment right, then they can come in and represent that right. Evans, the other cases, make no sense under that paradigm. And also, I want to point to a real-world difference in the way this case would be litigated if we had children and parents here instead of the lobbying arm of the, the litigation arm of the social media lobby. I know a lot of parents. I have three young kids. I don't know any parent who thinks that the right result to this case under a constitutional inquiry is all roads lead to strict scrutiny, which is fatal in fact, and therefore the states have to stand back and let the world's most sophisticated corporations protect the interests of their most vulnerable users. I think in an as-applied case where a child or parent could come in and say, hey, I think in this application, the law is unconstitutional because it's preventing me from doing X, Y, and Z, and there are no harms A, B, and C, that's the kind of litigation that would happen if we had the right party and interest litigating against the state. We don't have that. We have a litigant with very deep pockets and excellent lawyers that wants to immunize as much of its business model as possible from state regulation. Finally, I just want to step back. There was some suggestion that there are kind of buckets of companies and they're supposedly good guy companies and bad guy companies. I think that kind of falls into the content-based trap. I mean, that's not really what we're trying to do. Even kind of a, what your Honor described as a company that might be in the good guy bucket. There's an MDL going on in California right now and the plaintiff's lawyers got discovery into the internal documents of Meta, Instagram, all these companies, and it's a horror show. I mean, internal chats saying, oh my gosh, y'all, Instagram is a drug, LOL, all social media were basically pushers. You do understand that the reason I taxonomized the buckets that way was for First Amendment purposes. Yes, I agree. I'm not trying to say that anybody's good, anybody's bad, but I mean, you take the point. Yes. I take the point. It's just, I'm trying to make the kind of meta point of what we're trying to get at, right? It's not about, the question of what content is on the platform certainly matters for Moody and it matters for tailoring, but the thing we are targeting is not content qua content. It is the psychological damage associated with spending time on these platforms and if states are not allowed to have front end common sense regulations, then this is going to be sorted out on the back end by the plaintiff's bar and I'm not sure anybody's going to like the result there. Let me ask you before you sit down, two blocking and tackling questions about Moody, both of which I think Judge Lug and I have been asking about. Number one, do you view it sort of as a front end inquiry or a back end inquiry? And I think you know what I mean by that. Is this sort of like something that we tackle at the threshold, which I got to confess, like that's the way I've been thinking about it, but that's also a little weird that we're going to have like this huge evidentiary hearing to decide some kind of merits-y feeling questions before we get to any scrutiny. That feels a little weird. Do you have a view about that? So I hadn't thought about this question before and the way Moody was decided in the Supreme Court obscures it a little bit because you've got this weird framework where the court is saying look, because a court upheld the law, we're going to kind of go ahead and tell you some stuff about the First Amendment so that when you go back and do the Moody analysis, you're not just wasting your time because we've already decided that there is a First Amendment interest. So it's not, I don't think, quite clear for Moody itself, but I'll say this. As I've just been sitting here listening to the arguments, I've thought of it kind of like as a qualified immunity question where you can kind of go either way. I mean, if the plaintiffs in front of you in the court have not established like an as-applied First Amendment violation, then you don't necessarily need to get to it. On the other hand, if there's been no attempt to satisfy the multi-step framework of Moody, you can also simply rely on that ground because even if there was some as-applied violation of the First Amendment to the litigant, they would not be entitled to the relief they're seeking in their complaint, which is facial invalidation of the statute. So I think you could, it's, I think there, you could go either way in terms of which one you addressed first. I certainly don't think it is a, you know, back-of-the-line like remedial question, right? I do think it goes to your burden in a facial challenge under the First Amendment is this comparative exercise of constitutional versus unconstitutional applications. When you bring your case as a facial challenge, you're buying that merits inquiry as something you're going to have to complete. They did not attempt to do it here. The district court attempted to excuse them from that burden because they are opportunistically asserting the rights of users. For all the reasons we've discussed today, we don't think that works. Okay, second blocking and tackling question, and I think these are actually related, and it's about burden. Ms. Murphy's point is that, you know, sort of this is your burden, you know, you're the one with the speech regulation, you've got the burden. And your point, Judge Luck read from Moody, is that with respect to a facial challenge, in some respects it's their burden. And if this is sort of baked into the merits analysis, how is this working? Who's got the burden and when? I'll do my best with that. I mean, I think that in this posture that we're in right now, which is a preliminary injunction, our burden is to show that we'd be likely to succeed in satisfying intermediate scrutiny. I think that's certainly, that's our burden, we've carried it. The question of the Moody analysis, I'm going to take Moody as it comes to me and say that I think the burden is on them, and I think that has to do with the difference between identifying a First Amendment problem to the litigant in the case, and then conducting the balancing analysis. When you choose to bring a facial claim, you're trying to get a bigger advantage, in this case for the industry that Net Choice represents, right? I don't understand how the litigation choice by the plaintiff could then kind of trigger this burden on the state that they wouldn't have in the as-applied context that the Supreme Court, again, I think in Moody, is begging litigants to proceed under in the diverse and complicated world of the internet, where we encounter all these problems that we've talked about today. Very well. Thank you, Your Honor. Thank everyone. Really good arguments all the way around. Five lawyers who respected the court's time, which I'm appreciative. The case is submitted and the court will be in recess until tomorrow morning at 9 a.m.